FRANK H. GILBERT AND HAZEL P. PETERSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 50459. Filed October 24, 1955.

*Louis McClennen, Esq.*, for the petitioners.
*R. E. Maiden, Jr., Esq.*, for the respondent.

### OPINION.

FISHER, *Judge:* The respondent determined deficiencies in income tax against the petitioners for the taxable year 1949 in the amount of $47,603.77. The petitioners have asserted a claim for overpayment in the sum of $1,129.44. During the year 1949, petitioners were husband and wife and filed a joint income tax return for that year.

The questions presented are (1) whether or not petitioners may report the sale of stock on the installment basis where they received no initial payment other than the promissory note of the corporation during the taxable period in which the sale was made, and (2) in the event some initial payment is required, whether a cash dividend declared by the corporation several days prior to the sale of said stock to the corporation may be considered as a part of the purchase price of the stock.

All of the facts have been stipulated by the parties. They are found accordingly and incorporated herein by reference.

During the taxable year 1949, petitioners were husband and wife and resided in Phoenix, Arizona. On December 19, 1951, petitioners were divorced and on February 23, 1952, petitioner Hazel P. Peterson married Lowell D. Peterson. Petitioners filed a joint income tax return for the year 1949 with the collector of internal revenue for the district of Arizona.

During the taxable year 1949, petitioner Gilbert was one of the principal stockholders of the Arizona Water Company, Inc., hereinafter referred to as the Water Company, which was incorporated

under the laws of the State of Arizona about April 1, 1948. About the time of its incorporation, the Water Company issued 135 shares of stock to Gilbert and 135 shares to Clyde C. Matthews, totaling 270 shares and constituting all of the issued and outstanding stock of the corporation. The Water Company was engaged in the business of supplying water in and about the City of Phoenix, Arizona, hereinafter sometimes called the City.

Prior to the summer of 1949, pursuant to a vote of the residents of the City of Phoenix, a bond issue was authorized for the purchase by the City of private water company utilities serving the City of Phoenix and adjacent areas. During the summer of 1949, City representatives presented Gilbert and Matthews with a proposition to purchase all of the outstanding stock of the Water Company. The City and the two stockholders orally agreed to a sale price of $500,000, subject to adjustment for certain balance sheet items (such as accounts receivable and accounts payable) as of the closing date of the proposed sale. Prior to reducing the agreement to writing, however, the City had committed the authorized bond issue with the exception of approximately $130,000. Representatives of the City consequently advised Gilbert and Matthews that the City could not enter into a contract with them for the purchase of their stock in the Water Company for more than $130,000.

Thereafter, on or about September 29, 1949, a contract was entered into between Gilbert and Matthews and the city manager, on behalf of the City of Phoenix. On September 30, the duly executed contract was ratified by the council of the City of Phoenix. The contract provided, *inter alia*, that as of October 10, 1949, the City would purchase from Gilbert and Matthews, for $130,000, all of the capital stock of the Water Company which would then be outstanding. The contract also provided that, at the date of the consummation of the sale of the stock, the Water Company would be indebted to Gilbert and Matthews in the aggregate sum of $354,326.76, evidenced by 2 promissory notes, each in the principal amount of $177,163.38, and secured by a real and chattel mortgage on the assets of the corporation. As indicated below, said indebtedness of $354,326.76 represented the amount which the Water Company was to pay to Gilbert and Matthews for that part of the stock of the company which the City of Phoenix was not in a position to purchase from them directly.

On October 1, 1949, at a special meeting of the board of directors of the Water Company at which Gilbert and Matthews were present, a dividend of $10,800 was voted payable on October 5, 1949. The dividend of $10,800 was paid on October 5, 1949, $5,400 to Gilbert and $5,400 to Matthews. After this payment, the undistributed earnings and profits of the Water Company amounted to $30,486.49. At no time prior to the payment of the dividend had the Water Company paid any dividends to its stockholders.

On October 4, 1949, another meeting of the directors was held to consider an offer of Gilbert and Matthews to sell 196 shares of their capital stock in the Water Company to the corporation for the total price of $354,326.76. There was no provision for a downpayment in any form. The total consideration was to be evidenced by 2 promissory installment notes of the corporation, each in the principal amount of $177,163.38, together with interest at the annual rate of 5 per cent, and payable in 8 separate installments. The first payment of $22,-145.44 was due on March 1, 1950, and thereafter $22,145.42 was due on December 31, 1950, and every 6 months thereafter through December 31, 1953, inclusive. After due consideration of the proposal, a resolution was adopted to accept the offer and to execute and deliver 2 promissory notes, to be dated as of October 6, 1949, payable to Gilbert and Matthews, respectively, pursuant to the terms of the stockholders' offer of sale.

On October 6, 1949, the agreement of sale entered into at the October 4, 1949, directors' meeting was consummated by Gilbert and Matthews, each delivering 98 shares of their stock to the Water Company and each receiving the corporation's promissory notes secured by a real and chattel mortgage on substantially all of the assets of the Water Company.

Thereafter, on October 10, 1949, the sale contemplated in the contract with the City was also consummated, with Gilbert and Matthews each delivering 37 shares of their stock to the City in consideration of its cash payment of $130,000.

After October 10, 1949, neither Gilbert nor Matthews owned any stock of the Water Company.

On their 1949 income tax returns petitioners reported the $5,400 dividend payment as such. Petitioners also added together the gross proceeds of the two sales (the sale to the City and the sale to the Water Company), subtracted therefrom the cost of the 135 shares and the cost of the sale, and showed a gross profit from the two sales of $225,-434.14. The percentage of profit on the combined sales was 93.78445 per cent. Petitioners applied this percentage to the net payment received from the City in 1949 and included the resultant figure, $59,282.45, as long-term capital gains for 1949, and elected to report the remaining profit on the installment basis.

Subsequently, the respondent determined that petitioners' profit from the sale to the City was $58,070.78, and that it was properly reportable as capital gains. Petitioners do not take issue with this determination.

The respondent determined that petitioners' profit from the sale to the Water Company was $167,363.38, of which amount $15,243.24 was reportable as dividend income on the ground that the distribution was substantially equivalent to a dividend to the extent of available earn-

ings and profits, under section 115 (g) (1) of the Internal Revenue Code of 1939. Respondent, however, has conceded this issue and it is no longer before us for consideration.

Respondent has also determined that since petitioners did not receive a downpayment during the taxable year in which the sale was made to the Water Company, they were not entitled to report the gain thereof on the installment basis under section 44, and the balance of the gain in the amount of $152,120.14 was all reportable as capital gain in 1949.

There is no controversy as to the details of the transaction involved herein. The tax consequences resulting therefrom are, however, in dispute. It is the petitioners' position that section 44 does not require receipt of an "initial payment" during the taxable period as a prerequisite to reporting the profit of the sale to the corporation on the installment basis. Petitioners maintain that section 29.44–2, Regulations 111, the counterpart of section 44, which purports to construe the meaning of "initial payment" is clearly inconsistent with the statute and is invalid. Petitioners further contend that if a downpayment is required, the $5,400 dividend payment, declared by the Water Company on October 1, 1949, was in fact an integral part of the agreed consideration received for the sale of their stock to the Water Company on October 6, 1949, and accordingly qualifies as an "initial payment" within the intendment of section 44. Respondent opposes both contentions on the theory that the administrative regulation implementing section 44 is a reasonable interpretation of the statute, sanctioned by long usage, and should not be disturbed or invalidated. He also argues that the evidence clearly shows that the contracting parties considered the $5,400 payment only as a dividend, and that they did not intend to apply it to the purchase price of the stock. We hold for the respondent for the reasons stated hereinafter.

Section 44 (b) provides that, under regulations prescribed by the Commissioner with the approval of the Secretary, a person making a casual sale of personalty for a price exceeding $1,000, may report the profit from the sale on the installment basis if the initial payments do not exceed 30 per centum of the selling price. That section defines "initial payments" as the payments received in cash or property other than the evidences of indebtedness during the taxable period in which the sale is made.

As an aid to the interpretation of section 44 (b), pursuant to the discretionary authority delegated in the statute, the Commissioner in 1943 promulgated section 29.44–2, Regulations 111, which provides as follows:

Income may not be returned on the installment basis where no payment in cash or property, other than evidences of indebtedness of the purchaser is received

during the first year, the purchaser having promised to make two or more payments in later years.

Conceding that the regulation requires a downpayment to be received during the taxable year, petitioners contend that the administrative construction is based on an erroneous assumption and should be ignored by the Court. In essence, petitioners argue that because the initial payment may not exceed a stated percentage, it does not follow that Congress intended that some downpayment is essential to qualify under section 44. Petitioners would have us conclude that the regulation thus goes beyond the provisions of the statute and, therefore, amounts to unreasonable and unwarranted legislation.

We have not heretofore passed upon the question of whether the installment basis may be used when no payment whatever is received in the year of sale. The issue was raised in *Wagegro Corporation*, 38 B. T. A. 1225, 1229 (1938), but it was unnecessary for us to resolve it because we found, upon the facts, that there had been an initial payment.

The problem was discussed in relation to similar provisions of earlier Acts in G. C. M. 12148, XII-2 C. B. 57 (1933), and we find the following reasoning persuasive (pp. 56, 60) :

It may be argued that where no payment is received during the first year "the initial payments do not exceed 40 per centum of the selling price," and that the requirements of the statute are literally satisfied. But this is not so. Where no payment is received during the first year, the situation is not correctly and literally expressed by saying that the "initial payments do not exceed 40 per centum of the selling price," for this very statement implies two things, (1) that there has been an "initial payment," and (2) that it was not in excess of 40 per cent of the selling price, whereas the truth is that no "initial payment" has been made.

The only theory under which such a statement would correctly and literally express the situation would be to hold that there may be an initial payment of *zero*, but this is itself a contradiction in terms, for the term "payment" implies that "something" is paid, and zero is not "something"; it is literally "nothing."

We note also that the Senate Finance Committee, in its comments on the proposed sec. 453 (b) of the Internal Revenue Code of 1954 (which does not require receipt of an initial payment in the year of sale) recognized that the then existing law was otherwise. The report of the committee (S. Rept. No. 1622, 83d Cong., 2d Sess.) makes the following statement (p. 64) :

C. *Initial Payment Before Use of Installment Method* (sec. 453 (b))

   (1) *House changes accepted by committee*

Under present law, in order to use the installment method of reporting income in the case of sales of real property or casual sales of personal property some payment must be made in the year in which the sale occurs. There have been many legitimate transactions which could not be reported under the installment method merely because there was no payment in the year of sale.

The House and your committee's bill provide that in the future in the case of a sale of real property or a casual sale of personal property there need be no payment made in the taxable year in which the sale occurs.

In our opinion, the interpretation, in 1933, by the General Counsel, and the implementation of this approach in 1943 by Regulations 111, section 29.44–2, *supra*, are reasonable and consistent with the provisions of the statute. We think the regulation in question is, under the circumstances, an appropriate exercise of the power to prescribe regulations which is expressly granted in the statute. In the absence of weighty reasons to the contrary, we find no basis for determining that it is invalid. *Estate of Charles C. Smith*, 23 T. C. 367, 371 (1954). We hold, accordingly, that the receipt of some payment in cash or property in the year of sale is a necessary prerequisite to the right to use the installment basis under the provisions of section 44 (b) of the 1939 Code.

We next consider petitioners' argument that the close sequence of events in this case clearly demonstrates that the dividend declared by the corporation on October 1, 1949, regardless of its characterization, was in fact an integral part of the consideration received for the sale of the stock to the corporation on October 6, 1949, and is, therefore, an "initial payment" within the purview of section 44 (b). Relying on the same theory, petitioners also claim that they overpaid their tax for 1949 by reporting the dividend as ordinary income when they should have included the payment in the gross sale price of the stock and reported it as gain on the sale of capital assets.

Petitioners argue that the instant case is controlled by *E. M. Funsten*, 44 B. T. A. 1166 (1941); *James D. Boone*, 27 B. T. A. 1064 (1933); *Wagegro Corporation, supra;* and *First Savings & Trust Co., Executor*, 20 B. T. A. 272 (1930). We think none of these cases is apposite. In *Funsten*, petitioner made two casual sales of stock in the taxable year, with no downpayment, the total consideration in each instance being a promissory note. The contract of sale provided that any dividends declared or paid on the stock during the life of the note would be applied on the note in payment of principal and interest. Prior to the purchase of the stock and execution of the notes, the purchasers were assured that there would be a substantial dividend paid by the company on the stock before the close of the calendar year, and it was clearly understood that this dividend would serve as a payment on the sale of the stock. In accordance with this assurance, the company subsequently declared and paid a dividend during the taxable period which was applied to reduce the amount of the note. In holding that the dividend constituted an "initial payment" under section 44 (b), the Court stated that all the evidence clearly showed that such payments were "contemplated" by the parties

to the transaction, and the dividend had been earmarked to be applied on the note. Here, however, neither the contract with the City of Phoenix nor that with the Water Company in any way alludes to the dividend payment. Moreover, there is no evidence to show that at the time the promissory note was executed the parties had orally agreed to apply the dividend to the purchase price.

In *James D. Boone, supra,* we held that recitals in a contract were not conclusive, and allowed the taxpayer to introduce evidence at variance with the written instruments to show the real nature of the transaction. Thus the taxpayer was permitted to show that the actual consideration was that mentioned in an option and not in the formal contract of sale, and that the initial payment came within the limitation of section 44. Here, however, petitioners have not adduced any evidence to supplement or contradict the terms of the contract. Nor have petitioners offered an explanation, if any be available, indicating that the nature of the special directors' meeting of October 1, 1949, was other than for the purpose of considering the declaration of a dividend (without reference to the purchase of outstanding capital stock). We add that petitioners have not explained why they reported the payments as a dividend on their income tax returns if they regarded them as payments on account of purchase of stock.

*Wagegro, supra,* and *First Savings & Trust Co., supra,* are similarly distinguishable on the facts.

Respondent's determination is presumed to be correct, and the burden is upon petitioners to demonstrate error in such determination. We find nothing in the facts to support the view that the parties contemplated that the dividend payment would be an integral part of the agreed consideration for the stock.

In the light of the foregoing, we hold that petitioners have failed to meet the requirements of section 44 (b) and that all of the profit on sale of their stock must be treated as capital gain for the taxable year 1949.

*Decision will be entered under Rule 50.*